# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E.J.C.C., a minor, by and through his next friend and attorney, Beth Baltimore, | |
| *Petitioner-Plaintiff*, | Case No. 25-cv-08805 (CS) |
| v. | **VERIFIED AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT** |
| William JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Todd LYONS, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement; Kristi NOEM in her official capacity as Secretary of Homeland Security; Robert F. KENNEDY, JR. in his official capacity as Secretary of Health and Human Services; Angie SALAZAR, in her official capacity as Acting Director of the Office of Refugee Resettlement; Joseph B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; U.S. Department of Homeland Security; U.S. Immigration and Customs Enforcement; U.S. Department of Health and Human Services; U.S. Office of Refugee Resettlement; U.S. Citizenship and Immigration Services. | **ORAL ARGUMENT REQUESTED** |
| *Respondents-Defendants*. | |

## <u>INTRODUCTION</u>

1.      E.J.C.C. is 16 years old and an eleventh grader at a high school in the Bronx, where he is a valued member of his school community. He has a grant of Special Immigrant Juvenile ("SIJ") status, meaning that a court has found—and the Department of Homeland Security ("DHS") has agreed—that it is not in his best interest to be returned to his home country of Ecuador. On the morning of October 23, 2025, he should have been in second-period U.S. history

1

class. Instead, after dutifully complying with the government's directive that he present himself for an Immigration and Customs Enforcement ("ICE") check-in, Respondents summarily arrested and detained him. His wholly unjustified detention has separated him from his family, his school, and his broader community in the Bronx.

2.      E.J.C.C.'s detention and attempted removal violate his statutory and constitutional rights. For years, the government has recognized that SIJ status carries vested rights and a congressional guarantee of protection for vulnerable youth who cannot safely return to their countries of origin. In keeping with that understanding, the government has routinely shielded SIJ recipients from removal through grants of "deferred action," allowing them to remain in the United States and pursue lawful permanent residency as Congress intended. Here, however, after agreeing with the New York state court's finding that it is not in E.J.C.C.'s best interest to return to Ecuador and awarding him SIJ status, Respondents refused to provide him with an adjudication on deferred action and now attempt to remove him. These efforts amount to a *de facto*, unlawful revocation of SIJ status, depriving him of the statutory benefits Congress provided without any process, let alone due process. Moreover, Respondents' decision to summarily detain E.J.C.C. without notice or explanation violated his procedural due process rights and ICE's own regulations. His ongoing detention—particularly without any individualized review—serves no lawful purpose and runs afoul of the substantive and procedural due process protections of the Fifth Amendment, the Administrative Procedure Act ("APA"), the *Accardi* doctrine, and the Immigration and Nationality Act ("INA") and its implementing regulations.

3.      E.J.C.C. respectfully asks this Court to hold that his continued detention is unlawful and order his immediate release from custody, or in the alternative, hold a bond hearing.

**PARTIES**

2

4.      Petitioner-Plaintiff (hereinafter "Petitioner") E.J.C.C. is a citizen of Ecuador and a resident of New York City. He entered the United States with his mother on approximately December 4, 2022, seeking safety from gang violence and threats to their lives in Ecuador, and was subsequently granted SIJ status. E.J.C.C. had been at liberty until he was abruptly detained by ICE on the morning of October 23, 2025. He is presently in the custody and direct control of Respondents and their agents.

5.      Next friend Beth Baltimore is E.J.C.C.'s attorney. She accompanied E.J.C.C. to his ICE check-in on October 23, 2025, where she witnessed his detention by ICE. Because E.J.C.C. is a minor, his mother is not in the United States, and his father abandoned him, and they are unable to serve as E.J.C.C.'s representative in this action pursuant to Fed. R. Civ. P. 17(c)(1), Ms. Baltimore acts as E.J.C.C.'s next friend.

6.      Respondent William Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement within the United States Department of Homeland Security. In this capacity, he is also responsible for the administration of immigration laws and the execution of detention and removal determinations and is a legal custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office Director, 26 Federal Plaza, 7th Floor, New York, New York 10278.

7.      Respondent Todd Lyons is sued in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement. As the Acting Director of ICE, Respondent Lyons is a legal custodian of Petitioner.

8.      Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(a);

routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the Petitioner; and as such, is a legal custodian of the Petitioner.

9.    Respondent Robert F. Kennedy, Jr. is the Secretary of Health and Human Services ("HHS"). In this capacity, he ultimately oversees the Office of Refugee Resettlement ("ORR"), a sub-component of HHS, that is responsible for the care of unaccompanied minors.

10.    Respondent Angie Salazar is named in her official capacity as Acting Director of the Office of Refugee Resettlement. In this capacity, she oversees the staff of ORR who are responsible for the care of unaccompanied immigrant children.

11.    Respondent Joseph B. Edlow is named in his official capacity as Director of U.S. Citizenship and Immigration Services. In this capacity, he is responsible for administering and overseeing the program for SIJ classification and deferred action.

12.    Respondent U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent agency of Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services.

13.    Respondent U.S. Immigration and Customs Enforcement ("ICE") is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.

14.    Respondent U.S. Department of Health and Human Services ("HHS") is an executive department of the United States Government headquartered in Washington, D.C. HHS is the parent agency of the Office of Refugee Resettlement.

15.    Respondent Office of Refugee Resettlement ("ORR") is a component agency of HHS and is responsible for the care, custody, and wellbeing of unaccompanied immigrant children.

16.     Respondent U.S. Citizenship and Immigration Services ("USCIS") is a component agency of DHS and is responsible for administering and overseeing the program for SIJ classification and deferred action.

### JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus), Art. I § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

18.     Federal district courts have jurisdiction to hear habeas claims brought by noncitizens challenging the lawfulness of their detention. *See Demore v. Kim*, 538 U.S. 510, 516–17 (2003) (recognizing habeas jurisdiction over immigration detention challenges); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (same); *Tran v. Mukasey*, 515 F.3d 478, 482 (5th Cir. 2008) (same).

19.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (e)(1) because E.J.C.C. is detained within the Southern District of New York, his immediate physical custodian is located within this District, and a substantial part of the events giving rise to this petition occurred and continue to occur within this District.

### FACTUAL ALLEGATIONS

20.     E.J.C.C. is a 16-year-old boy who fled Ecuador with his mother in late 2022. *See* Exhibit A (Notice to Appear). His father had abandoned him and his mother was his primary caretaker prior to her departure in September 2025.

21.     E.J.C.C. entered the United States with his mother on or about December 4, 2022. After being arrested and briefly detained at the border, the government released E.J.C.C. and his mother and the two traveled to New York upon their release.

22.     In July 2023, E.J.C.C. was served with an administrative warrant for his arrest and a Notice to Appear ("NTA") before an Immigration Judge ("IJ") but was not arrested at that time. *See* Exhibits A; B (Arrest Warrant). Per a Notice of Custody Determination, they were released on their own recognizance. Exhibit C (Custody Determination and Order of Release on Recognizance).

23.     Shortly after they arrived to the United States, they were charged with being subject to removal pursuant to Section 212(a)(6)(A)(i) of the INA (8 U.S.C. § 1182(a)(6)(A)(i)) and directed to appear before an Immigration Judge in September 2023 in New York, NY.  His and his mother's case was placed on the Dedicated Docket, an accelerated track for family units—initiated in 2021—which has been widely criticized for undermining access to counsel and meaningful preparation time, leading to high in-absentia removal rates and other due-process concerns.[1]

24.     E.J.C.C.'s mother sought asylum, with E.J.C.C. as a derivative on her application. She hired private counsel who, upon information and belief, withdrew on the day of—and immediately before—their final asylum hearing in February 2024.

25.     The IJ denied E.J.C.C.'s mother's application for asylum. The IJ issued a final order of removal on February 28, 2024. Exhibit D (Order of Removal). E.J.C.C. and his mother did not

---

[1] *DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings*, DEPT. OF JUSTICE (May 28, 2021), https://www.justice.gov/archives/opa/pr/dhs-and-doj-announce-dedicated-docket-process-more-efficient-immigration-hearings; UCLA CTR. FOR IMMIGR. L. & POL'Y, THE BIDEN ADMINISTRATION'S DEDICATED DOCKET IN LOS ANGELES 2 (May 2022) (finding the Dedicated Docket's accelerated timeline exacerbates due-process problems and correlates with low representation and high removal orders), https://law.ucla.edu/sites/default/files/PDFs/Center_for_Immigration_Law_and_Policy/Dedicated_Docket_in_LA_Report_FINAL_05.22.pdf; HARVARD IMMIGR. & REFUGEE CLINICAL PROGRAM ET AL., DENIAL OF JUSTICE: THE BIDEN ADMINISTRATION'S DEDICATED DOCKET IN THE BOSTON IMMIGRATION COURT 4–6 (June 2023) (documenting large share of children on the Dedicated Docket, and due-process concerns tied to speed and representation gaps), http://harvardimmigrationclinic.org/files/2023/06/Dedicated-Docket-Report_FINAL.pdf.

appeal the denial of the asylum application or the final order of removal, as they were unrepresented, did not understand the process, and lacked resources. *See* Exhibit E (EOIR docket entries and order); Exhibit F (Withdrawal of Counsel Order).

26.     Following those proceedings, ICE placed E.J.C.C.'s mother under an order of supervision (OSUP), through the Intensive Supervision Appearance Program (ISAP) pursuant to which she wore a monitoring device from July 2025 until she left the United States. While at liberty, she and E.J.C.C. complied with all program requirements, including appearing for scheduled check-ins. *See* Exhibit G (compliance documentation).

27.     In May 2024, his mother began the family court process to be appointed her son's guardian. On December 17, 2024, she received orders from the Bronx County Family Court, appointing her as E.J.C.C.'s guardian, and finding that his father had abandoned him within the meaning of New York State law, and that it is not in his best interest to return to Ecuador. Exhibit H (Special Findings Order). In granting the orders, the Family Court acknowledged the safety and opportunities available to E.J.C.C. in the United States.

28.     On December 23, 2024, E.J.C.C. petitioned for SIJ status with the United States Citizenship and Immigration Services[2] (USCIS).

29.     On April 15, 2025, USCIS granted E.J.C.C.'s petition for SIJ status. Exhibit I (SIJ Approval Notice).

---

[2] USCIS is the sub-agency of the Department of Homeland Security with exclusive jurisdiction over SIJ petitions, including both granting and revoking SIJ status. *See* 8 C.F.R. §§ 204.11(d); 205.2. Other DHS sub-agencies, such as ICE and Customs and Border Patrol, can neither grant nor revoke SIJ status. *Id.*

30.    USCIS's April 15, 2025 approval did not include any deferred-action determination, even though USCIS's 2022 SIJ deferred-action policy remained publicly in effect until USCIS announced its rescission on June 6, 2025.

31.    Since the beginning of the 2025-2026 school year, E.J.C.C. has been enrolled in 11th grade at a public high school in the Bronx. Exhibit J (School Enrollment and Schedule). He is a valued member of his school community. His teachers describe him as responsible, committed to his education and to learning English, and a leader in his College and Career Readiness class. *See* Exhibit K (Letter from School).

32.    On September 22, 2025, E.J.C.C.'s mother attended an ICE check-in at which ICE ordered E.J.C.C.'s mother to purchase a flight to Ecuador prior to September 30, 2025, threatening that she would likely be detained at the next ICE check-in if she did not do so. ICE did not similarly order E.J.C.C. to leave the country or otherwise suggest they would attempt to detain or remove him. ICE set the next check in for E.J.C.C. and his mother, if she remained in the United States, for October 23, 2025. *See* Exhibit G.

33.    On September 27, 2025, E.J.C.C.'s mother made the painful decision to return to Ecuador on a commercial flight, despite the danger that she faced there, to avoid inhumane conditions in ICE detention and the accompanying trauma of being arrested. Before her departure, his mother designated a family member to have temporary entrustment of E.J.C.C.'s care and to take responsibility for his health, school, and other matters. She felt assured that E.J.C.C. would be protected from detention and removal given he has a pathway to permanent status in the United States through his approved SIJ petition. As his parent and guardian, his mother made the difficult decision that even though she could no longer stay in the United States, it is in E.J.C.C.'s best

interest to remain in New York where he has a pathway to status, where he is enrolled in school, and where he has a caring adult to look after him.

34.    Although E.J.C.C.'s mother departed from the United States prior to this scheduled check in, E.J.C.C. dutifully complied with the government's directive and appeared with counsel for the scheduled ICE check in at 26 Federal Plaza on October 23, 2025. Officers directed him and counsel to 201 Varick Street—and then detained him without any prior notice.

35.    Immediately after his detention, immigration counsel attempted to file an I-246 ICE stay of removal at 26 Federal Plaza, but she was told it was not possible since E.J.C.C. was still "in transit." *See* Exhibit L (Stay of Removal).

36.    On October 24, 2025, Petitioner's counsel submitted a Form I-246 Request for Stay of Removal to ICE seeking an immediate administrative stay in light of Petitioner's approved SIJ status and pending habeas petition. As of the filing of this Amended Petition, ICE has not granted any stay and has provided no written decision on the request.

37.    E.J.C.C. was detained at 201 Varick Street, New York, New York from the morning of October 23, 2025 until he was transferred to ORR custody in the Bronx, New York later that same day. E.J.C.C. remains in ORR custody in the Bronx, New York.

38.    While in ORR custody, E.J.C.C. is required to attend the facility's education program, *i.e.*, in a "structured classroom setting, Monday through Friday," rather than enrollment in a New York State public school. 45 C.F.R. § 410.1302(c)(3). These classes are not part of the state public-school system, and credits from ORR shelters may not be accepted by local school districts, meaning time in custody does not reliably advance him toward graduation. *See* 8 N.Y.C.R.R. § 100.5(d)(5). This forced transfer mid-semester interrupts E.J.C.C.'s courses, severs continuity with his teachers, and risks that work completed in ORR will not translate into New

York credits—delaying re-enrollment and pushing him off his on-time graduation track. These are non-compensable educational harms that cannot be remedied after the fact.

39.    After E.J.C.C.'s detention was reported in the media, a spokesperson for the Department of Homeland Security, Tricia McLaughlin, admitted that the government intends to deport E.J.C.C.[3]

40.    E.J.C.C. has no administrative or other process through which he can challenge his detention or removal.

## **LEGAL FRAMEWORK**

### A. *SIJ Status Provides a Pathway to Permanent Status for Certain Vulnerable Young People*

41.    Congress expressly designed SIJ status to allow children like E.J.C.C. to remain in the United States to pursue lawful permanent resident ("LPR") status. *See* 8 U.S.C. § 1255(h) (deeming SIJ youth "paroled" for adjustment); 8 U.S.C. § 1227(c) (waiving specified removal grounds for SIJ); *cf.* 8 U.S.C. § 1155; 8 C.F.R. § 205.2 (revocation only with notice, reasons, and an opportunity to respond).

42.    In 1990, Congress created SIJ status to protect vulnerable immigrant children and provide them a pathway to lawful permanent residence.  Immigration Act of 1990, Pub. L. No. 101-649, § 153, 104 Stat. 4978 (1990) (amending various sections of the INA); Special Immigrant Status, 58 Fed. Reg. 42843, 43844 (Aug. 12, 1993) ("This rule alleviates hardships experienced by some dependents of United States juvenile courts by providing qualified [noncitizens] with the

---

[3] Ana Ley, *A Woman Self-Deported, Hoping to Shield Her Son. He Was Detained Anyway.*, NEW YORK TIMES (Oct. 24, 2025), https://www.nytimes.com/2025/10/24/nyregion/teenager-detained-mother-self-deported.html ("'His mother self-deported to Ecuador and Camas remained in the U.S.A. alone as a minor,' Ms. McLaughlin wrote in an email. 'Fortunately, now Mr. Camas will be reunited with family.'").

opportunity to apply for special immigrant classification and lawful permanent resident status, with [the] possibility of becoming citizens of the United States in the future."). Since 1990, Congress has amended the INA multiple times to expand the protections of SIJ status, most recently in 2008, through the Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457, § 235(d), 122 Stat. 5044 (2008).

43.     To be granted SIJ status, youths like E.J.C.C. must first "satisfy[] a set of rigorous, congressionally defined eligibility criteria." *Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 163 (3d Cir. 2018). Specifically, the INA provides that those eligible for SIJ designation, as relevant here, are noncitizen youth who are present in the United States; who have been declared dependent on a state juvenile court; who cannot be reunified with one or more parents because of abuse, neglect, or abandonment; and for whom it has been determined that it is not in their best interest to return to their country of origin. 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c).

44.     Crucially, a noncitizen youth may only maintain SIJ status if he or she is "*present in the United States.*" 8 U.S.C. § 1101(a)(27)(J) (emphasis added). This requirement makes perfect sense in light of the purpose of the SIJ statute. SIJ status is predicated on a state court finding that the youth cannot be safely reunited with one or more parent(s), nor safely sent back to their country of origin. The design of this program, then, "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for LPR status." *Garcia v. Holder*, 659 F.3d 1261, 1271 (9th Cir. 2011) (abrogated on other grounds).

45.     Youth can apply for SIJ status upon receipt of the aforementioned state court findings. The application process includes submitting a Form I-360 SIJ Petition to USCIS, along with the predicate state court order and other supporting evidence. *See* 8 C.F.R. § 204.11(b). USCIS then considers the application and supporting documentation to determine whether to exercise its

statutory "consent function" to approve the petition. *See* 8 U.S.C. § 1101(a)(27)(J)(iii). By exercising its statutory consent function to grant SIJ status, the agency recognizes the state court's determinations, including that the child's return to their country of origin would be contrary to their best interests. *Id.*

46.     SIJ status may be revoked only for what the Secretary of Homeland Security deems "good and sufficient cause." 8 U.S.C. § 1155; 8 C.F.R. § 205.2. According to USCIS regulations, such revocation must be made upon notice to the youth, who must be permitted the opportunity to submit evidence in opposition. *See* 8 C.F.R. § 205.2. If status is ultimately revoked, the youth is entitled to notice and the opportunity to appeal the decision. *See Id*. § 205.2(c) & (d). Revocation of a SIJ petition may only be performed by a USCIS officer authorized to approve such a petition in the first instance. *See Id*. § 205.2(a).

47.     The main benefit of SIJ status—and indeed, its core purpose—is that it confers on vulnerable young people like E.J.C.C. the right to seek LPR status *See* 8 U.S.C. § 1255(h). Accordingly, youth with SIJ status must be "provide[d] . . . an opportunity to pursue adjustment of status." *Del Cid, et al., v. Bondi*, No. 3:25-CV-00304, 2025 WL 2985150, at *4 (W.D. Pa. Oct. 23, 2025).

48.     To facilitate this process, Congress removed numerous barriers to adjustment of status for SIJ status beneficiaries through amendments to the SIJ provisions in 1991 and again in 2008. For example, SIJ youth are "deemed . . . to have been paroled into the United States" for the purposes of adjustment of status. 8 U.S.C. § 1255(h)(1). Further, Congress exempted SIJ youth from many common inadmissibility grounds and created a generous waiver of many of the non-exempted inadmissibility grounds. 8 U.S.C. § 1255(h)(2). Here, DHS has asserted E.J.C.C. is removable based on conduct that predates E.J.C.C.'s SIJ approval on April 15, 2025.  Congress,

however, explicitly provided that specified grounds for removal "shall not apply to a special immigrant described in section 1101(a)(27)(J) of this title [the SIJ statute]" when they are "based upon circumstances that existed before the date the [noncitizen] was provided such special immigrant status." 8 U.S.C. § 1227(c). Accordingly, those pre-SIJ allegations cannot support removal; any remaining admissibility concerns are inapplicable or waivable under § 1255(h)(2).

49.     Although SIJ renders youth eligible to apply for adjustment, they can only do so when a visa is immediately available to them. 8 U.S.C. § 1255(h). However, there is an annual limit on visas available to SIJ beneficiaries. 8 U.S.C. § 1153(b)(4). And since 2016, the number of SIJ beneficiaries has surpassed the supply of available visas for most countries, leaving what has been estimated to be more than 100,000 young people in a backlog, waiting to apply for a green card.

50.     Despite the immediate unavailability of visas, waitlisted SIJ beneficiaries are the same vulnerable young people that the SIJ statute was designed to protect. The fact that no visa is currently available because a numerical limit has been reached changes nothing about their eligibility determination by USCIS, or Congress's intent that they be afforded a pathway to LPR status and, eventually, citizenship. These are the same individuals whom state courts have determined cannot safely be reunited with their parent(s) or returned to their home country.

51.     Taken together, the structure of the SIJ program—including the requirement that recipients remain in the United States to pursue relief, the grant of parole for the purpose of adjustment, and the waiver of grounds of inadmissibility and removability—evinces Congress' intent that SIJ status recipients remain safely in the United States until they can adjust to become LPRs. Because SIJ is an adjustment-of-status pathway pursued from within the United States,

removing an SIJ beneficiary before a visa becomes available would effectively nullify the protection Congress created. See 8 U.S.C. §§ 1101(a)(27)(J), 1255(h)(1)–(2), 1227(c).

**B.**  ***The Government Recently Ceased Granting Deferred Action, Despite Prior Findings that it is Necessary to Give Meaning to Congress' Intent That SIJ Beneficiaries Be Protected***

52.     In March 2022, to address the SIJ visa backlog, USCIS announced that all young people granted SIJ status would also be considered for a discretionary grant of deferred action, meaning that they would be protected from deportation while waiting for a visa to become available ("SIJ Deferred Action Policy"). In enacting this policy, USCIS acknowledged that "Congress likely did not envision that SIJ petitioners would have to wait years before a visa became available."[4] Persons granted deferred action are shielded from deportation and are eligible to apply for employment authorization under 8 C.F.R. § 274a.12(c)(14).[5]

53.     Under the SIJ Deferred Action Policy, USCIS was required to automatically evaluate whether an approved SIJ recipient "warrant[ed] a favorable exercise of discretion" through a grant of deferred action.[6]

54.     That automatic review applied to all approved SIJ beneficiaries who were unable to apply for adjustment of status solely because, due to the backlog, an immigrant visa number was not available. Such determinations were made on a case-by-case basis, and USCIS granted deferred action to SIJ beneficiaries for renewable four-year periods.[7]

---

[4] USCIS, Policy Alert PA-2022-10, at 1 (Mar. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf ("2022 Policy Alert"); *see also* USCIS, Training regarding SIJ Deferred Action Background, at 11–12, https://www.ilrc.org/sites/default/files/2025-09/FOIA%20Results%20on%20SIJS%20Deferred%20Action%20Policy.pdf.
[5] 2022 Policy Alert, at 2.
[6] *Id.*
[7] *Id.*

55.     Under this Policy, noncitizens whom the government had approved for SIJ status were neither required nor permitted to submit separate requests for deferred action; their Form I-360 Petition for SIJ status was sufficient for consideration for deferred action.[8] USCIS concurrently updated its Policy Manual to reflect the SIJ Deferred Action Policy.[9]

56.     USCIS issued a Form I-797 Notice of Action to inform a SIJ petitioner whether their I-360 petition for SIJ status had been approved. Under the SIJ Deferred Action Policy, the I-797 nearly always included USCIS's decision on deferred action.

57.     Between May 2022 and July 2023, 92,499 SIJ beneficiaries were granted deferred action from among 92,592 eligible individuals who had received a deferred action decision—reflecting a deferred action grant rate of more than 99 percent.[10] Between July 1, 2023, and March 31, 2025, USCIS approved 120,258 additional SIJ petitions.[11]

58.     Importantly, "USCIS has the sole authority to grant and terminate deferred

---

[8] *Id.*

[9] *See* USCIS POL'Y MANUAL vol. 6, pt. J, ch. 4.G. (archived Apr. 18, 2025), https://web.archive.org/web/20250418205752/https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-4.

[10] USCIS PUB. ENGAGEMENT DIV., USCIS RESPONSES TO QUESTIONS SUBMITTED BY THE END SIJ BACKLOG COALITION FOLLOW UP QUESTIONS 4 (March 2023), https://www.uscis.gov/sites/default/files/document/questions-and-answers/USCISResponsetoEndSIJSBacklogCoalition-FollowUpQuestions.pdf.

[11] USCIS IMMIGR. & CITIZENSHIP DATA, NUMBER OF I-360 PETITIONS FOR SPECIAL IMMIGRANT WITH A CLASSIFICATION OF SPECIAL IMMIGRANT JUVENILE (SIJ) BY FISCAL YEAR, QUARTER, AND CASE STATUS FISCAL YEARS 2010-2025, https://www.uscis.gov/sites/default/files/document/data/i360_sij_performancedata_fy2025_q2.xlsx (last visited Oct. 27, 2025) (showing 70,859 SIJ petitions approved in FY 2024 and 31,183 SIJ petitions approved in the first two quarters of FY 2025, through March); USCIS, I-360, Petition for Amerasian, Widow(er), or Special Immigrant, https://www.uscis.gov/sites/default/files/document/data/i360_sij_adjudications_fy23q4.csv (last visited Oct. 27, 2025) (showing 18,216 SIJ petitions approved in the last quarter of Fiscal Year 2023—between July 1 and September 30) (70,859 + 31,183 + 18,216 = 120,258).

action for noncitizens with SIJ classification."[12] And, generally, USCIS may only terminate deferred action "if the SIJ-classified individual was not eligible at the time of the initial grant of deferred action, the SIJ Form I-360 is revoked, or if they are no longer eligible based on new information."[13]

59.    Beginning on or about April 7, 2025—and while the SIJ Deferred Action Policy remained posted in USCIS guidance—USCIS approval notices for SIJ petitions began to omit any deferred-action determination.[14] At the same time, USCIS continued to publish Form G-325A listing "SIJ DA" as a filing basis and issued receipt and biometrics notices for such filings, but did not issue decisions on those SIJ-based deferred action requests.[15]

60.    On June 6, 2025, USCIS formally rescinded the SIJ Deferred Action Policy, deciding to no longer consider granting deferred action to SIJ youth waiting to apply for a green card. USCIS announced via an online Policy Alert its decision "to eliminate automatic consideration of deferred action (and related employment authorization) for [SIJ beneficiaries] who are ineligible to apply for adjustment of status" due to visa unavailability (the "2025 Policy

---

[12] USCIS MEMO RE: SPECIAL IMMIGRANT JUVENILE (SIJ) DEFERRED ACTION (June 26, 2023), at 130, https://www.ilrc.org/sites/default/files/2025-09/FOIA%20Results%20on%20SIJS%20Deferred%20Action%20Policy.pdf.
[13] *Id.*
[14] Solcyré Burga, *Young Immigrants Who Have Faced Abuse and Neglect Sue Trump Administration for Exposing Them to Deportation*, TIME (July 2025), https://time.com/7303651/immigration-youth-sue-trump-lawsuit-sijs/ (reporting that, "[b]eginning in April, [USCIS] began neither approving or denying SIJ status recipients' work permit applications," and only later issued a policy alert ending automatic deferred-action consideration).
[15] *See* USCIS POL'Y MANUAL vol. 6, pt. J, ch. 4.G.; USCIS, G-325A, "Biographic Information (for Deferred Action)" (Jan. 20, 2025 ed.), https://www.uscis.gov/sites/default/files/document/forms/g-325a.pdf.

Alert").[16]

61.       Here, E.J.C.C.'s application fell within the April–June 2025 period prior to formal rescission of deferred action: USCIS approved E.J.C.C.'s SIJ petition on April 15, 2025, but his I-797 approval notice does not include any deferred-action determination.  Young people like E.J.C.C., whose SIJ petitions were approved between April-early June 2025, were therefore unlawfully denied consideration for deferred action in violation of USCIS's own stated policy. *See* Exhibit I (SIJ Status Approval Note, dated April 15, 2025).[17]

### C. Legal Framework and Policies Governing Custody and Release of Immigrant Children

62.       Each year, thousands of children flee violence, persecution, and abuse in their home countries, and seek protection in the United States. Many of these children come from countries where gang violence, government corruption, and instability create conditions that make these regions among the most dangerous for children. According to the United Nations, nearly two-thirds of immigrant children from these regions have experienced harms that qualify them for international refugee protection. Federal law recognizes that minors are distinctively vulnerable and establishes a child-welfare framework, not a carceral one, to govern their custody and release.

63.       In the 1980s and 1990s, immigrant children who arrived to the United States were routinely locked up for months in unsafe and unsanitary jail cells, in remote facilities across the country. These conditions prompted a federal lawsuit, *Flores v. Reno*, which resulted in a 1997 consent decree that set national standards for the detention, release, and treatment of immigrants

---

[16] USCIS, POLICY ALERT: SPECIAL IMMIGRANT JUVENILE CLASSIFICATION AND DEFERRED ACTION, (June 6, 2025) ("2025 Policy Alert"), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20250606-SIJDeferredAction.pdf.

[17] The rescission of the deferred action policy is currently being challenged in a separate lawsuit, *A.C.R. v. Noem*, No. 1:25-cv-3962, in the Eastern District of New York. Should class certification be granted, E.J.C.C. will be a class member and may be eligible for deferred action.

in government custody. In addition to setting certain minimal detention standards, *Flores* guarantees that children shall be released "without unnecessary delay" and requires the Government to undertake "prompt and continuous efforts" towards family reunification, as well as guarantees children the right to a bond hearing before an immigration judge. Although the government has attempted to replace *Flores* by regulation, federal courts have preserved its core protections for decades. In 2024, after HHS promulgated comprehensive regulations governing the Unaccompanied Children ("UC") program, the *Flores* court partially terminated the consent decree as to HHS, finding that the new rule "meets or exceeds" *Flores*'s key standards, while leaving *Flores* in place as to DHS.

64.     In 2002, Congress passed the Homeland Security Act ("HSA") which transferred the care and custody of unaccompanied immigrant children from the Immigration and Nationality Service[18] ("INS") to the Office of Refugee Resettlement ("ORR"), housed within the Department of Health and Human Services. ORR is not a security agency; its mission is to "incorporat[e] child welfare values" into the care and placement of unaccompanied immigrant children.

65.     Congress further codified and strengthened these protections. The 2008 William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that (1) DHS transfer unaccompanied children to HHS custody within 72 hours (absent exceptional circumstances), 8 U.S.C. § 1232(b)(3); (2) ORR "promptly place[]" such children "in the least restrictive setting that is in the best interest of the child," *id*. § 1232(c)(2); and (3) with limited exceptions not relevant here, place them in full removal proceedings under 8 U.S.C. § 1229a rather than expedited removal, *id*. § 1232(a)(5)(D).

---

[18] The INS is the predecessor agency to ICE.

66.        ORR's online guide[19] also contains procedures governing the release of children in its care. The guide provides for ORR to "begin[] the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care." For children without a viable sponsor in the United States, ORR has a long-term foster-care program through which children who have demonstrated "safe behavior in a non-secure setting" can be placed with families in the community, rather than a shelter. ORR also has policies and procedures that "require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as 'sponsors.'"

67.        In 2024, HHS/ORR issued the Unaccompanied Children Program Foundational Rule—the first comprehensive, binding regulations governing ORR's custody, care, placement, and release of unaccompanied children. 45 C.F.R. part 410 (effective July 1, 2024). The rule formalizes long-standing *Flores*/TVPRA principles: child-welfare decision-making; least-restrictive placement; prompt family reunification with appropriate sponsor vetting; access to counsel and supportive services; and robust grievance, oversight, and monitoring structures. It became effective July 1, 2024.

68.        Critically, the law's "least restrictive setting" and "best interests" mandates are not satisfied by mere transfer to ORR; they require prompt reunification or release to a suitable sponsor whenever safe and feasible. Congress charged ORR with making "continuous efforts" toward family placement, and ORR's governing policies prioritize release to a parent, legal guardian, or other qualified adult relative able to provide care and physical custody. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2). In other words, the system is designed to avoid exactly

---

[19]  ORR Unaccompanied Alien Children Bureau Policy Guide, ORR (Aug. 8, 2025), https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

what DHS did here: separating a child from a safe placement only to re-institutionalize him. Where a child already resides safely with a caregiver in the community, seizing the child at a check-in and funneling him into shelter-level custody (or any more restrictive placement) is the opposite of "least restrictive" and serves no best-interest rationale.

**D. The INA only permits detention of noncitizens with final orders of removal in specific circumstances.**

69.    8 U.S.C. § 1231 authorizes the detention of individuals following a final order of removal only under specifically delineated circumstances. 8 U.S.C. § 1231(a)(3) provides that an individual who is not removed within a 90-day statutory removal period "*shall* be subject to supervision" (emphasis added) under specific terms, including requirements that he or she appear periodically before an immigration officer and obey any written restrictions. *See also* 8 C.F.R. § 241.5 (specific conditions for release—including reporting requirements and efforts to obtain travel documents—when an order of supervision is issued).

70.    The INA contemplates noncitizens may remain at liberty post-final order, and permits detention only in narrow, specified circumstances tied to individualized findings and procedures. The relevant regulatory framework (8 C.F.R. §§ 241.4(l) and 241.13(i)) authorizes revocation of an individual's release on an OSUP only in certain contexts. Section 241.4(l) specifies revocation may occur upon violation of the conditions of release or when, in the district director's opinion, revocation is in the public interest because one of four conditions is met: "(1) the purposes of release have been served; (2) the alien violates any condition of release; (3) it is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (4) the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." 8 C.F.R. § 241.4(l)(2). Revocation under § 241.4(l) requires an individualized, evidence-based determination tied to one of these four triggers and compliance with the post-order

custody review procedures; a generalized intent to remove is not enough.

71.     Section 241.13(i) provides further conditions where release decisions may be revoked, but it applies only to individuals previously detained post-final order and released under § 241.13 (i.e., after a finding that removal is not significantly likely in the reasonably foreseeable future) and allows revocation only "for the purpose of removal" when concrete developments make removal practicable (e.g., newly available travel documents or diplomatic acceptance). *See* 8 C.F.R. § 241.13(i)(1)–(2). Neither regulation authorizes detention of a compliant SIJ recipient absent such individualized findings and present feasibility of removal.

72.     Here, the government made no individualized § 241.4(l) finding tied to one of the four triggers, provided no notice or reasoned revocation decision, and identified no § 241.13(i) development making removal presently practicable. To the contrary, E.J.C.C.'s approved SIJ status and statutory protections (8 U.S.C. §§ 1255(h), 1227(c)), together with USCIS's still-owed SIJ deferred-action determination from April 15, 2025, make removal neither lawful nor reasonably foreseeable at this time. His detention therefore exceeds the narrow detention authority these provisions provide.

## CLAIMS FOR RELIEF

## CLAIM I

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706 (ARBITRARY AND CAPRICIOUS)

73.     Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

74.     Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

### *Attempted Removal of E.J.C.C. from the United States Violates the APA*

75.    Respondents' attempt to remove E.J.C.C. from the United States is arbitrary and capricious, not in accordance with the law, and contrary to constitutional right for at least three reasons grounded in the government's decision to provide him with SIJ status.

76.    First, "SIJ status, once granted, may not be revoked except 'on notice,' 8 C.F.R. § 205.2, and upon the Government's compliance with a series of procedural safeguards: The Secretary of Homeland Security must find 'good and sufficient cause' for revocation; the agency must provide notice of intent to revoke; and the SIJ designee must be given the opportunity to present evidence opposing revocation." *Osorio-Martinez*, 893 F.3d at 163–64 (citing 8 U.S.C. § 1155; 8 C.F.R. § 205.2; 7 USCIS Policy Manual, pt. F, ch. 7 (Mar. 21, 2018)). Further, SIJ youth have appeal rights for any adverse ruling. *Id*. Accordingly, E.J.C.C. is entitled to these statutory protections before his SIJ status may be revoked. And because the INA requires that a youth be present in the United States to have SIJ status, forced removal from the United States would render him ineligible, constituting a *de facto* revocation of his SIJ status. *See* 8 U.S.C. § 1101(a)(27)(J). Therefore, removing E.J.C.C. from the United States would be contrary to law. For similar reasons, such a *de facto* revocation of his SIJ status violates his right to notice and an opportunity to be heard under the Due Process Clause of the Fifth Amendment, *see infra* ¶¶ 106–111.

77.    Second, removing E.J.C.C. is arbitrary and capricious and contrary to law because it would contravene the very purpose of the SIJ statutory framework. The core purpose of SIJ protection is to provide beneficiaries like E.J.C.C. with a means to become a LPR from within the United States even where their presence would otherwise be unlawful. *See* 8 U.S.C. § 1255(h)(2).

Because physical presence in the United States is required to adjust status pursuant to SIJ, E.J.C.C. must remain present in the United States to avail himself of that process. *See* 8 U.S.C. § 1101(a)(27)(J). Allowing E.J.C.C. to be removed from the United States after he has already been granted SIJ status would thus eviscerate Congress' goal in creating the status in the first place. To ensure that any removal of SIJ beneficiaries does not violate the SIJ statutory scheme, courts have held that "the Government must provide [individuals with SIJ status] an opportunity to pursue adjustment of status, and the way in which the Government seeks to remove them must adequately take stock of their SIJ Status." *Del Cid, et al.*, 2025 WL 2985150, at *4. This is because "Congress granted SIJ designees a clear set of rights, including eligibility to apply for adjustment to LPR status," and removing a SIJ beneficiary from the United States before they are eligible to would "summarily strip[]" this right from them. *Osorio-Martinez v. Atty. Gen. U.S. of Am.*, 893 F.3d 153, 178–79 (3d Cir. 2018). Therefore, removing E.J.C.C. right now, before he has had an opportunity to pursue adjustment of status, does not "adequately take stock of [E.J.C.C.'s] SIJ Status" and is therefore contrary to law. *Del Cid, et al.*, 2025 WL 2985150, at *4.

78.     Third, it is arbitrary and capricious for ICE, a subcomponent of DHS, to seek to remove E.J.C.C. while USCIS, another subcomponent of DHS, has granted E.J.C.C. relief pursuant to the SIJ statutory scheme. These are contradictory, opposing positions from within the same agency, which the agency has failed to explain and reconcile. In *Joshua M. v. Barr*, 439 F. Supp. 3d 632 (E.D. Va. 2020), the district court considered this exact issue and held that (1) the petitioner was likely to succeed on the merits of his APA claim "based on potentially arbitrary and capricious actions" and (2) the petitioner, a SIJ beneficiary, was entitled to a temporary stay of removal. *Id*. at 679–80, 682. Specifically, the court found it "peculiar that the DHS grants [the petitioner] relief pursuant to the SIJ statutes while another agency within DHS, Immigration and

Customs Enforcement, simultaneously pursues removal." *Id*. at 680. "These seemingly opposing positions within the Executive Branch raise questions about the arbitrary and capricious nature of such actions." *Id*; *see also Lee Lumber and Bldg. Material Corp. v. N.L.R.B.*, 117 F.3d 1454, 1460 (D.C. Cir. 1997) (an agency's failure to explain "inconsistency is arbitrary"); *Gen. Chem. Corp. v. U.S.*, 817 F.2d 844, 846 (D.C. Cir. 1987) ("internally inconsistent and inadequately explained" agency action is arbitrary and capricious). Accordingly, ICE's re-detention and attempt to remove E.J.C.C. while he was granted SIJ status by USCIS—after his order of removal was entered—is arbitrary and capricious.

79.     For these same reasons, Respondents' re-detention of Petitioner pursuant to 8 U.S.C. § 1231(a)(6) is arbitrary and capricious, not in accordance with the law, and contrary to constitutional right. Specifically, since Petitioner cannot be lawfully removed from the United States, his detention serves no legitimate purpose and violates his substantive and procedural due process rights, *see infra* ¶¶ 101–105, 112–117.

### Placement of E.J.C.C. in Institutional Custody Violates the APA

80.     Additionally, and independently, Respondents acted arbitrarily, capriciously, and contrary to law by disregarding the controlling child-welfare framework governing custody and release of immigrant children. Congress, through the HSA and the TVPRA, requires that unaccompanied children be maintained in the least restrictive setting appropriate to their needs and that the government undertake prompt and continuous efforts toward placement with qualified family sponsors. *See* 6 U.S.C. § 279(b)(1)(C)–(D); 8 U.S.C. § 1232(c)(2). DHS's own juvenile regulation likewise requires prompt transfer and child-appropriate custody decisions. *See* 8 C.F.R. § 236.3 (including transfer to HHS/ORR within 72 hours). And the *Flores* Settlement Agreement requires release "without unnecessary delay" and prioritizes placement in the community.

81.     Respondents' decision to detain Petitioner flies in the face of the statutory regime's contemplation that minors remain in the least restrictive setting.

82.     By seizing a sixteen-year-old from an existing, stable family home in the Bronx—where he has been living with relatives and attending school—and funneling him toward institutional custody while he waits to apply for adjustment of status, Respondents ignored an "important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) inverted the statutory sequence that favors family placement over institutional care, and failed to explain why less-restrictive alternatives (further check-ins or immediate reunification with the identified family sponsor) were inadequate. Respondents were obligated to preserve (or at least assess and document) the already-available relative sponsor and to coordinate release consistent with § 1232(c)(2)–(3) and *Flores*. Their failure to perform that analysis renders the decision unreasoned. *See Judulang v. Holder*, 565 U.S. 42, 53 (2011)

## CLAIM II

### VIOLATION OF THE *ACCARDI* DOCTRINE; ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)

83.     Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

84.     When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 266-268 (1954). The *Accardi* doctrine also obligates agencies to comply with procedures set out in their operative manuals and binding guidance. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (finding that an agency is obligated to comply with procedural rules outlined in its internal manual).

### *Violation of Applicable Detention Regulations*

85.     Respondents have violated the applicable regulations governing detention following a final order of removal—8 C.F.R. §§ 241.4(l), 241.5, and 241.13(i)—by failing to provide Petitioner with a particularized notice of the reason(s) of the revocation of his release and an opportunity to respond to the allegations contained therein. Respondents also have not—and cannot—identify any permissible reasons under §§ 241.4(l)  and § 241.13(i) for the revocation of Petitioner's release because (1) E.J.C.C.'s approved SIJ status provides him statutory protections from removal until he has an opportunity to apply for adjustment of status and (2) USCIS must still provide E.J.C.C. a SIJ deferred action determination, rendering his removal neither lawful nor reasonably foreseeable at this time. Re-detention therefore exceeds the narrow re-detention authority these provisions provide.

### *Violation of SIJ Deferred Action Policy*

86.     Further, Respondents have violated their own SIJ Deferred Action Policy, which was in effect when Petitioner was granted SIJ status on April 15, 2025.

87.     Under the SIJ Deferred Action Policy that was effective between March 7, 2022 and June 6, 2025, USCIS was required to automatically evaluate whether an approved SIJ recipient "warrant[ed] a favorable exercise of discretion" through a grant of deferred action.[20] While in effect, youth granted SIJ status were virtually always also granted deferred action with the I-360 approval notice.

---

[20] 2022 Policy Alert, at 2; *see also* USCIS POL'Y MANUAL vol. 6, pt. J, ch. 4.G.1, ("USCIS considers deferred action for an alien with SIJ classification if the person cannot apply for adjustment of status solely because an immigrant visa number is not immediately available. . . . A separate request for deferred action is not required, nor will it be accepted, for aliens with SIJ classification who are ineligible to adjust status solely because an immigrant visa number is not immediately available. USCIS automatically conducts deferred action determinations for such persons.").

88.      E.J.C.C.'s petition for SIJ status was approved on April 15, 2025—squarely within the policy window and almost two months before USCIS rescinded the SIJ Deferred Action Policy. Yet E.J.C.C.'s SIJ approval notice contains no deferred-action determination, he has not received such a determination to date; and the agencies have proceeded as if no consideration were due.

89.      This constitutes a failure to abide by the government's own binding policy that was in effect at the time E.J.C.C.'s petition for SIJ status was approved, and is thus a violation of the *Accardi* doctrine.

90.      "[W]hen the Government promulgates a regulatory process for obtaining relief, a right to seek relief is created, even when there is no right to the relief itself." *Arevalo v. Ashcroft,* 344 F.3d 1, 15 (1st Cir. 2003) (citing *Accardi*, 347 U.S. at 268). That principle applies here: although deferred action is discretionary, once USCIS committed to automatic consideration for SIJ recipients, it was bound to provide that process. Thus, USCIS's failure to provide a deferred-action determination on Petitioner's April 15, 2025 approval—during the period when automatic consideration remained in force—violated its own rules.

91.      The government's arrest of E.J.C.C. exacerbates this violation by seeking to detain him for the purpose of his removal when he is still owed a determination on deferred action, which would almost certainly be approved for E.J.C.C. and therefore protect him from both arrest, detention, and removal.

## CLAIM III

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(1) (AGENCY ACTION UNLAWFULLY WITHHELD)

92.      Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

93.     Under the Administrative Procedure Act, an "agency shall proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). When an agency fails to do so, a court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

94.     A claim under § 706(1) can proceed "where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). A failure to act "is simply the omission of an action without formally rejecting" or approving an application. *Id.* at 63.

95.     As discussed above, during the period from March 7, 2022 through June 6, 2025, USCIS publicly adopted and implemented a policy, reflected in the USCIS Policy Manual and accompanying guidance, under which it would automatically consider approved SIJ recipients for deferred-action determination along with the Form I-360 approval notice. *See supra* ¶¶ 52–56. That framework imposed a nondiscretionary procedural obligation on USCIS to decide—i.e., to render and communicate a deferred-action determination for each approved SIJ beneficiary while the policy remained in effect.

96.     The APA requires agencies to conclude matters presented to them within a reasonable time, and courts routinely compel agency action where such a duty exists, even if the ultimate outcome of the action is discretionary. *See, e.g.*, *Nigmadzhanov v. Mueller*, 550 F. Supp. 2d 540, 545–46 (S.D.N.Y. 2008) (recognizing that while "whether to grant or deny an application" for adjustment of status is discretionary, "one cannot infer from that the existence of discretion to never decide it at all."); *Villa v. U.S. Dep't of Homeland Sec.*, 607 F. Supp. 2d 359, 363 (N.D.N.Y. 2009) ("While it is within the Attorney General's discretion to grant or deny an application for adjustment of status, it is not within his discretion to not adjudicate at all."). Accordingly, USCIS's

failure to render a deferred-action determination for Petitioner, despite granting him SIJ status during the period when the agency's binding policy remained in effect, constitutes agency action unlawfully withheld in violation of 5 U.S.C. § 706(1).

## CLAIM IV

### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE CONSTITUTION (PROCEDURAL DUE PROCESS); ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. §§ 702, 706

97.     Petitioner repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

98.     The procedural due process guarantee of the Fifth Amendment requires that individuals be provided notice and an opportunity to be heard before being deprived of liberty or property interests. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Even "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *U.S. v. Salerno*, 481 U.S. 739, 746 (1987). "The Supreme Court long ago held that the Fifth Amendment entitles noncitizens to due process in removal proceedings." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024). "To satisfy procedural due process, non-punitive detention must be accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure the detention serves the government's legitimate goals." *Padilla v. U.S. Immig. and Cust. Enf't*, 704 F. Supp. 3d 1163, 1174 (W.D. Wash. 2023) (collecting cases).

99.     The three-factor test articulated by the Supreme Court in *Mathews*, 424 U.S. 319, provides the relevant framework "to determine what process is due to noncitizens in removal proceedings," *Black*, 103 F.4th at 147 (collecting cases), and confirms his entitlement to a hearing. The *Mathews* factors are: (1) "the private interest that will be affected by the official action"; (2)

"the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

### *E.J.C.C.'s Detention Violates the Due Process Clause of the Fifth Amendment*

100.    In contrast to other habeas petitioners challenging their detention, E.J.C.C. "has been afforded no review of his detention." *Primero v. Mattivelo*, No. 1:25-CV-11442, 2025 WL 1899115, at *5 (D. Mass. July 9, 2025). "To the contrary, Respondents have made no suggestion that there has been any review of Petitioner's record to determine that his detention was warranted to ensure his removal." *Id.* (internal quotations omitted). Further, Respondents neither gave E.J.C.C. a warning that he would be detained at his check-in nor the opportunity to contest that detention. The government's decision to arrest E.J.C.C. without any notice or an opportunity to respond, and continue to detain him without any opportunity to meaningfully challenge that detention, clearly fails *Mathews*.

101.    First, E.J.C.C. has a substantial, legally protectable liberty interest. *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) ("the interest in being free from imprisonment" is "the most significant liberty interest there is").

102.    Second, the risk of erroneously depriving E.J.C.C. of that interest is severe. At only sixteen years old, he has been suddenly separated from his caregiver, community and school. Despite his best efforts to follow the demands of the federal immigration system, he has been thrown into sudden instability. He has been afforded absolutely no process, let alone constitutionally sufficient process, prior to or since this deprivation, making the value of additional process high. *See Eldridge*, 424 U.S. at 343. To protect against the risk of erroneous deprivation,

the government must provide a custody hearing in which it must justify his detention based on a showing of changed circumstances. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) (finding government required to provide prompt hearings to re-detained unaccompanied minors), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

103.    Third, the government's interest in detaining E.J.C.C. without a hearing on whether that detention is necessary is minimal. On the one hand, the government has no interest in detaining noncitizens—especially children—who cannot be removed and present no flight risk or danger. E.J.C.C. is firmly settled in New York, he attends school, and he has no criminal history. He has also dutifully complied with all of the conditions that Respondents have placed on him, including attending the check-in at which he was arrested. On the other hand, additional process would entail little to no burden on the government. *See Mathews*, 424 U.S. at 347. Indeed, "additional procedural safeguards" would not "undercut [the government's] interests" in ensuing that E.J.C.C. appears at future ICE check-ins and protecting public safety. *Black v. Decker*, 103 F.4th 133, 153 (2d Cir. 2024). And "additional resources that the government will need to expend to justify continued detention at bond hearings will be minimal—and will likely be outweighed by costs saved by reducing unnecessary detention." *Id*. at 154–55. Further, a core function of ORR pursuant to its statutory mandate is to routinely make determinations about whether unaccompanied minors' detention is necessary or if they can be released to an adult in the community. *See Saravia*, 905 F.3d at 1140 (discussing ORR's obligations to make such custody determinations).

104.    E.J.C.C.'s continued detention without an opportunity to be heard therefore violates his procedural due process rights under the Fifth Amendment of the Constitution.

### *De Facto Revocation of E.J.C.C.'s SIJ Status Violates the Due Process Clause of the Fifth Amendment*

105.    In addition, and independently, E.J.C.C. has not been afforded notice and an opportunity to be heard concerning the government's *de facto* revocation of his SIJ status by seeking to forcibly removal him from the United States. Under the *Mathews* test, this clearly violates his procedural due process rights.

106.    First, E.J.C.C. has a substantial, legally protectable property and/or liberty interest in his SIJ status. SIJ status reflects "the determination of 'Congress to accord those abused, neglected, and abandoned children a legal relationship with the United States and to ensure they are not stripped of the opportunity to retain and deepen that relationship without due process.'" *Joshua M.*, 439 F. Supp. 3d at 678 (quoting *Osorio-Martinez*, 893 F.3d at 170). Indeed, Congress afforded SIJ beneficiaries robust process by statute, *see id; supra* ¶¶ 41–51; 8 U.S.C. § 1155; 8 C.F.R. § 205.2, and granted them "access to federally-funded education and preferential status for employment-based green cards," *J.L. v. Cissna*, 374 F. Supp. 3d 855, 869 (N.D. Cal. 2019). For such reasons, at the motion to dismiss stage, courts have found that "SIJ status may constitute a protected liberty or property interest." *Joshua M.*, 439 F. Supp. 3d at 679; *J.L.*, 374 F. Supp. 3d at 869.

107.    Second, the risk of erroneously depriving E.J.C.C. of his interest in his SIJ status is severe. By removing E.J.C.C. from the United States, the government will effectively revoke his SIJ status as well as his ability to adjust to LPR status, *see* 8 U.S.C. § 1101(a)(27)(J), without following the substantive and procedural requirements for such revocation. Such a revocation would be erroneous. Moreover, these high stakes make the value of additional process extremely high, and he should be given notice and an opportunity to be heard, in line with the SIJ statute and regulations' due process mandates, *see* 8 U.S.C. § 1155; 8 C.F.R. § 205.2, before any revocation of his SIJ status.

108.    Third, the government's interest in revoking E.J.C.C.'s SIJ status without additional process is entirely nonexistent. The SIJ statutory framework and regulations themselves require notice and an opportunity to be heard before SIJ status may be revoked for cause. 8 U.S.C. § 1155; 8 C.F.R. § 205.2. The government cannot have an interest in undermining the laws of the United States.

109.    The *de facto* revocation of E.J.C.C.'s SIJ status without notice and an opportunity to be heard therefore violates his procedural due process rights under the Fifth Amendment of the Constitution.

110.    In summary, the Due Process Clause entitles E.J.C.C. to meaningful process assessing whether his detention is justified and whether revocation of his SIJ status is proper. E.J.C.C.'s re-arrest, detention, and forced removal without an opportunity to contest his detention or the revocation of his SIJ status in front of a neutral adjudicator after he had been living and going to school in the United States for years provide insufficient process and violates the Due Process Clause of the Fifth Amendment of the Constitution.

## CLAIM V

**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE CONSTITUTION (SUBSTANTIVE DUE PROCESS) AND THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C. § 1231(a)(6); ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. §§ 702, 706**

111.    Petitioner repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112.    The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas*, 533 U.S. at 690.

113.    Noncitizens unquestionably have a substantive liberty interest to be free from detention. *See id*. Because "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the government may imprison people as a preventive measure only within strict limits. *Foucha v. Louisiana*, 504 U.S. 71, 83 (1992) (quoting *U.S. v. Salerno*, 481 U.S. 739, 755 (1987)). Immigration detention is civil and must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]" so that it remains "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690 (cleaned up); *see also Schall v. Martin*, 467 U.S. 253, 264 (1984) (finding detention must be a proportional—not excessive—response to a legitimate state objective). Courts have identified only two legitimate purposes for immigration detention: mitigating flight risk and preventing danger to the community. *See Zadvydas*, 533 U.S. at 690; *Velasco Lopez v. Decker*, 978 F.3d 842, 853–54 (2d. Cir. 2020). If a person cannot actually be removed, "preventing flight" is a "weak or nonexistent" justification. *Zadvyda*s, 533 U.S. at 690; *cf. Phan v. Reno*, 56 F. Supp. 2d 1149, 1156 (W.D. Wash. 1999) ("Detention by the INS can be lawful only in aid of deportation."). Detention for community safety, in turn, is only permissible "when limited to specially dangerous individuals and subject to strong procedural protections." *Id*. at 691.

114.    Similarly, in the context of 8 U.S.C. § 1231(a)(6)—the statute governing the detention of noncitizens with final removal orders—if "removal is not reasonably foreseeable, continued detention is unreasonable and no longer authorized by statute." *Primero*, 2025 WL 1899115, at *4; *see also Sepulveda Ayala v. Bondi*, No. 2:25-CV-01063, 2025 WL 2084400, at *9 (W.D. Wash. July 24, 2025); *Munoz-Saucedo v. Pittman*, No. 25-CV-2258, 2025 WL 1750346, at *5 (D.N.J. June 24, 2025); *Ali v. Dep't of Homeland Sec.*, 451 F. Supp. 3d. 703, 706–07, 709 (S.D. Tex. 2020).

115.    Petitioner has a fundamental liberty interest in being free from official restraint. Here, as discussed *supra* ¶¶ 75–78, the government may not lawfully remove E.J.C.C. in the foreseeable future. This eliminates any justification of flight risk, which the government could not show in any event, given E.J.C.C.'s years-long residence in the United States, his deep ties to his school, family and community in New York, and his ability as an SIJ beneficiary to eventually adjust to LPR status and then gain citizenship. And E.J.C.C.'s lack of any criminal record eliminates any possible justification of danger.

116.    Because E.J.C.C.'s removal is not reasonably foreseeable and there is no other justification for his detention, as discussed *supra* ¶¶ 75–79, his detention is neither authorized by 8 U.S.C. § 1231(a)(6) nor related to any legitimate government interests, in violation of the substantive due process protections of the Fifth Amendment as well as § 1231(a)(6).

## <u>CLAIM VI</u>

### RELEASE PENDING ADJUDICATION

117.    E.J.C.C. repeats and re-alleges the allegations contained in all preceding paragraphs of this Petition as if fully set forth herein.

118.    Pursuant to *Mapp v. Reno*, this Court has the "inherent authority" to set bail pending the adjudication of a habeas petition when the petition has raised (1) substantial claims and (2) presents extraordinary circumstances that (3) "make the grant of bail necessary to make the habeas remedy effective," 241 F.3d 221, 226 (2d Cir. 2001).

119.    E.J.C.C. asserts numerous substantial constitutional and statutory claims challenging his detention.

120.    E.J.C.C. has also demonstrated multiple extraordinary circumstances which make him eligible for bail, including his young age, his SIJ status, and the severe disruption to his

education that may be nearly impossible to remedy post-detention.

121.     He respectfully requests immediate release pending adjudication of the instant petition.

### **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

a.     Assume jurisdiction over this matter;

b.     Enjoin the Respondents from transferring Petitioner away from the jurisdiction of this District and enjoin his removal pending these proceedings;

c.     Declare that Petitioner's arrest and detention violate the Due Process Clause of the Fifth Amendment; the Administrative Procedure Act; the *Accardi* Doctrine; and the Immigration and Nationality Act and implementing regulations;

d.     Issue a Writ of Habeas Corpus ordering Respondents to immediately release Petitioner from custody without restraints on his liberty;

e.     Stay Petitioner's removal from the United States until he is given an opportunity to apply for adjustment of status;

f.     Order Respondents to promptly render an individualized determination on deferred action for Petitioner pursuant to the SIJ Deferred Action Policy;

g.     Award reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

h.     Grant such other and further relief as law and justice require.

Dated: October 27, 2025
      New York, N.Y.

Respectfully submitted,

/s/ Elizabeth Gyori
Elizabeth Gyori
Amy Belsher
Wafa Junaid
Bobby Hodgson
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, Floor 19
New York, New York 10004
(212) 607-3300
egyori@nyclu.org

Beth D. Baltimore
THE DOOR'S LEGAL SERVICES CENTER
121 Avenue of the Americas, 3rd Floor
New York, New York 10013
917-701-9130
bbaltimore@door.org

*Attorneys for Petitioner-Plaintiff*

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's

attorneys. I have discussed with the Petitioner the events described in this Petition and reviewed

relevant documentation. Based on those discussions and review, upon information and belief, I

hereby verify that the factual statements made in the Verified Petition for Writ of Habeas Corpus

are true and correct to the best of my knowledge.

                                                     _____

                                                     Beth D. Baltimore

                                                     *Attorney for Petitioner*